# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

October 14, 2005



Clarence Maddox
Clerk, U.S. District Court
301 N MIAMI AVE STE 150
MIAMI FL 33128-7788

**Appeal Number: 05-13351-JJ**
Case Style: USA v. Carla Knight
District Court Number: 00-06159 CR-UUB

The following action has been taken in the referenced case:

Appellee's Motion to Supplement the Record is Granted.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Carol P. Lewis (404) 335-6179

MOT-2 (03-2004)

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Appeal No. 05-13351-JJ
District Court No. 00-6159-CR-UUB

UNITED STATES OF AMERICA,   )
                            )
    Plaintiff-Appellee,      )
                            )
- versus -                  )
                            )
                            )
CARLA KNIGHT,               )
                            )
    Defendant-Appellant.     )
_____/

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

## MOTION TO SUPPLEMENT RECORD

The United States of America, pursuant to <u>Fed</u>. <u>R</u>. <u>App</u>. <u>P</u>. 10(e), moves this

Court to supplement the record on appeal in the above-entitled case and states:

1. The brief for the United States, responding to Appellant's appeal of her

sentence for her violations of probation, is being filed today, contemporaneously with

this motion.

2. United States Magistrate Judge Stephen T. Brown held an evidentiary

hearing regarding Appellant's violations of probation, upon referral by the district

court, Hon. Ursula Ungaro-Benages.  The transcripts of the hearing, DE:110, 111,

112, were filed with the court. An additional transcript, of the deposition of Mary L. Davis, an elderly and infirm witness who was unable to appear in court, was considered by both the magistrate judge and by the district court upon a de novo, review of the record (see DE:113:2; DE:132:2). However, the transcript was not filed with the court and it does not appear on the docket sheet. Attached to this motion is a copy of the deposition. Although the sole issue on appeal concerns the length of Appellant's sentence, and she does not contest the court's decision to revoke her probation, we wish to provide the court with a complete record of the proceedings below.

3. The undersigned attempted to reach counsel for Appellant by telephone to ascertain her position on the motion, but the undersigned has not received a response as of the making of this motion.

WHEREFORE, the United States of America respectfully requests that this

Court grant this request to supplement the record on appeal with the appended

deposition transcript.


Respectfully submitted,

R. Alexander Acosta
United States Attorney

By: _____
Harriett Galvin
Assistant United States Attorney
99 N.E. 4th Street
Miami, Florida 33132
Tele: (305)  961-9120
Fax:  (305) 536-7214

3

## Certificate of Service

I hereby certify that an original and 6 copies of the foregoing Motion for the

United States was sent by regular mail to Kristi F. Kassebaum, Esq., 2937 S.W. 27th

Avenue, Coconut Grove, Florida 33133.

Harriett Galvin
Assistant United States Attorney

Page 1

```
1              IN THE COUNTY COURT OF THE 17TH
         JUDICIAL CIRCUIT, IN AND FOR BROWARD
2           COUNTY, FLORIDA.  CIVIL DIVISION

3              CASE NO: 00-6159-CR-UUB

4

5   UNITED STATES OF AMERICA,

6            Plaintiff,
    v.
7

    CARLA KNIGHT,
8
             Defendant.
9   _____/

10
                        MARY LEE DAVIS
11                      624 NORTHWEST 9TH AVENUE
                        APARTMENT ONE
12                      FORT LAUDERDALE, FLORIDA, 33311
                        MAY 28TH, 2004
13                      11:00 A.M.

14

15                     ------------

16                      DEPOSITION

17                         OF

18                    MARY LEE DAVIS

19

20

21

22

23

24

25
```

ORIGINAL

Page 2

```
 1   APPEARANCES:      LAW OFFICE OF HARRY WALLACE, JR
                       14480 SOUTHWEST 37TH STREET
 2                     MIRIMAR, FLORIDA, 33027
                       BY:  HARRY C. WALLACE.
 3
                       LAW OFFICE OF PAUL KORCHIN
 4                     FEDERAL PUBLIC DEFENDER
                       150 WEST FLAGLER STREET, SUITE 1700
 5                     MIAMI, FLORIDA, 33130
                       BY:  PAUL KORCHIN, ASA
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          Deposition of Mary Lee Davis, a witness of lawful age,

2    taken by the Defendants for the purpose of discovery and for use

3    as evidence in the above-entitled cause, wherein UNITED STATES OF

4    AMERICA is the Plaintiff, and CARLA KNIGHT, is the Defendant,

5    pending in the COUNTY Court of the 17th Judicial Circuit in and

6    for Broward County, Florida, pursuant to notice heretofore filed,

7    before BARBARA WINER, a Reporter and Notary Public in and for the

8    State of Florida at Large, at 624 NORTHWEST 9TH AVENUE, Broward

9    County, Florida, on the 28TH day of MAY, 2004, commencing at 11:00

10    o'clock A.M.

11

12

13                    — — — — — — — — —

14    Thereupon:

15                    MARY LEE DAVIS

16    a witness named in the notice heretofore filed,

17    being of lawful age, and being first duly sworn in

18    the above cause, testified on HER oath as

19    follows:

20

21

22

23

24

25

1                    DIRECT EXAMINATION

2    BY MR. WALLACE:

3        Q    Could you state your name for the record, please?

4        A    Mary Lee Davis.

5        Q    Ma'am, my name is Harry Wallis, I am the

6    prosecutor in this case, I represent the United States

7    Government.  We have some questions to ask you and before

8    we get started, I just wanted to make sure -- I spoke with

9    you before and you told me that you had hurt your ankle and

10   you had to stay in the bed and we are seeing that now.  In

11   fact, you are being deposed now and you are in your bed as

12   we speak, right?

13       A    Uh-huh.

14       Q    You are going to have to give me an oral response

15   like a yes or a no so the court reporter can write it down.

16       A    Okay.

17       Q    Now, most of my questions will be about last

18   year, the March to June timeframe from last year.

19       A    Okay.

20       Q    How long have you lived at this residence right

21   there?

22       A    Since 1985 I lived on the other end, I have been

23   in this apartment for thirty four years.

24       Q    You have been in this apartment building?

25       A    This apartment here since 1985 but I lived in

Page 5

```
 1    621, the rest of the years, I have been here for thirty

 2    four years.

 3         Q    And 621 is a similar type of apartment to this

 4    one?

 5         A    Yes, the same apartment, just on a different

 6    street.

 7         Q    And this is 624 9th Avenue?

 8         A    Yes --flooded me out and they brought me over

 9    here in 1985 but it is the same apartment.

10         Q    And are these low income apartments?

11         A    No, no, no, regular rate.  I pay one hundred and

12    six dollars a week.

13         Q    One hundred and six dollars a week?

14         A    Yes.

15         Q    Okay.  And who resides here with you?

16         A    In this apartment?

17         Q    Yes.

18         A    Nobody but me.

19         Q    Okay.  And how long have you lived alone, Ma'am?

20         A    I have been in and out of my granddaughter's

21    house here, I lived in this apartment since 1985.

22         Q    Okay.  And when you lived here since '85 you have

23    already lived alone?

24         A    Yes, nobody lived here with me.

25         Q    All right.  And your granddaughter's name?
```

Page 6

```
 1       A     Terrence Houston.

 2       Q     Okay.

 3       A     That is where I came from when I was in the

 4  accident, I just come here about three weeks ago.  I was

 5  living there.

 6       Q     Oh, so you stayed with your granddaughter for a

 7  while?

 8       A     Yes, at 232 Northwest 19th Avenue.

 9       Q     So when you were in the accident, this was a car

10  accident I take it?

11       A     Yes.

12       Q     And who was driving?

13       A     Mildred Moore.

14       Q     Is that a friend of yours?

15       A     I know her, she comes in and out and talks to me

16  and stuff.

17       Q     Okay.  When I spoke to you before you told me

18  that you were legally blind I think?

19       A     Yes.  Since 2000.

20       Q     Although you are legally blind, you can see

21  people, correct?

22       A     Yes.  I can see some.

23       Q     You can tell the difference between me and the

24  defense lawyer that is standing over to your left?

25       A     Yes.
```

Page 7

```
 1      Q     You can identify faces can't you?

 2      A     Yes.

 3      Q     Okay.  Do you have a niece by the name of Carla

 4   Knight?

 5      A     She is not kin to me.

 6      Q     She is not related to you?

 7      A     Not at all, I never knew her till she owned a

 8   house across the street and her and the lady that was

 9   standing in the house Viola Prescott, came over her one

10   day, I was talking to --he wanted me to come over there,

11   then I went over to 627 to Carla, and I guess her mother

12   was there and there was a big uproar about the lady in the

13   apartment, so I never knew Carla, so I say to Carla, The

14   lady daughter died and left two children, don't put her

15   out.  Carla said she was going to get a three day eviction

16   notice and move her out.  So then the man Prescott offered

17   to give Carla the rent and she said, No, I want to --won't

18   accept the rent from the people, and that is how I got to

19   know Carla.

20      Q     Okay.  In order to clarify that situation a bit,

21   what I understand that you are saying is that when you

22   first met Carla Knight, some of your neighbors were having

23   a dispute with her about the house that Carla Knight owned,

24   is that correct?

25      A     That is correct.
```

Page 8

1    Q    Okay.  And when you went there, you were kind of

2    like a mediator in this situation?

3    A    Right.

4    Q    Okay.  And Carla Knight was about to evict your

5    friend from over in this house?

6    A    Right.

7    Q    And rather than accept the rent from them, she

8    said, If they gave you the rent she would take the rent

9    from you because she didn't want to deal with them, is that

10   correct?

11   A    Yes.

12   Q    And that is the first time you met Carla?

13   A    First time I have ever seen her in my whole life,

14   so help me God, I have never seen her before in my life.

15   Q    The record should reflect that the witness has

16   actually placed her left hand on a bible that is on the bed

17   with her.  But that is not necessary, Ma'am.

18   A    Okay.  But I never knew her before then.

19   Q    And when was that?

20   A    It was last year, abo9ut a month before she put

21   the credit card fraud on me.

22   Q    Okay.

23   A    Then Viola Prescott sent her husband over to tell

24   me to come over there --

25        MR. KORCHIN:  I am sorry, I have an objection,

1    you asked the question when, if you could just make it

2    a little --

3         MR. WALLACE:  Yes, what the defense counsel is

4    saying you have to just answer my question.

5         THE WITNESS:  Okay.

6    BY MR. WALLACE:

7    Q    Do you remember whether this was February or

8    March?

9    A    I don't know.  I can't answer that.

10   Q    But it was early in the year?

11   A    Early in the year.

12   Q    Okay.  Now, after you met Carla Knight on this

13   time at Viola Prescott's house, when was the next time you

14   saw Carla Knight?

15   A    About a week later.  She come to pick up the

16   seven hundred and fifty dollars from me.  The lady brought

17   me the rent over here, Carla give me the her number to call

18   her when I get the rent and she would come and pick it up

19   and she came and picked it up from me.

20   Q    She picked it up about a week later.

21   A    And she gave me a receipt.

22   Q    And you were to take the receipt and give it to

23   the Prescotts?

24   A    Carla made out the receipt and I gave the receipt

25   to the --

1     Q     And did there come a time when Carla Knight asked

2     you or you asked her about you getting a foreclosure house?

3     A     I asked her, she said she had a foreclosure house

4     so I said what is the price and she said ten or fifteen

5     thousand dollars, and I said I would like to get one.  She

6     never told me the price.  The next couple of days or two

7     she came back and said she needed my credit and social

8     security number if I wanted to get the house, so I gave it

9     to her.

10     Q     Let me ask you something else, you said she

11     mentioned the price of ten thousand to fifteen thousand

12     dollars?

13     A     Yes.

14     Q     What was that for?

15     A     For the foreclosure house.

16     Q     That was to buy the house?

17     A     To buy the house.

18     Q     Ten thousand to fifteen thousand?

19     A     Yes.

20     Q     Okay.  Now, you said that she told you that she

21     needed your credit and your social security number?

22     A     Right.  When she got the credit, she didn't get

23     the social security number then .

24     Q     What do you mean she got your credit?

25     A     She asked me did I have credit.  I said yes.  So

1    she taked it out.

2        Q    You didn't give her any document with your credit

3    history?

4        A    No, I didn't give her nothing like that.  I told

5    her I had good credit.  I didn't give her no papers, no

6    nothing.  I told her I got good credit.  And two days she

7    came back, she say, Oh, you can get anything you want, your

8    credit is so good, you can buy a four hundred thousand

9    dollar house without any down payment.  That is what she

10   said to me.

11       Q    Let me interrupt for a second.  When she came

12   back and told you you had good credit and you could get

13   this four hundred thousand dollar house, had you already

14   given her your social security number?

15       A    I don't know.  When I first gave it to her, she

16   come in my house and asked what was my social security with

17   the right number and I told her, ███████████.  This is what

18   I tell her.

19       Q    How, who are you telling this to?

20       A    Carla.

21       Q    She asked you for your social security?

22       A    And I gave her the number.

23       Q    And when you gave her your social security

24   number, it was your understanding that she was going to run

25   your credit and see if you qualify for a foreclosure house?

1       A    Right.

2       Q    When she came back and told you that you qualify

3   for a four hundred thousand dollar house without any down

4   payment, did you want to do that?

5       A    No, I did not because I can't afford a four

6   hundred thousand dollar house, I only get five hundred and

7   eighty four dollars a month from the government, how can I

8   afford that kind of house?

9       Q    Okay.  So what was your response when she told

10  you you could get a four hundred thousand dollar house?

11      A    A couple of days later she came back and told me

12  the foreclosure was too high to buy them.  She didn't say

13  what they cost, after she had said ten or fifteen thousand,

14  she came back and tell me they were too high for me to buy

15  the foreclosure.

16      Q    Okay.  Did she suggest that you buy the four

17  hundred thousand dollar house?

18      A    No, she didn't give me none of that.  She didn't

19  say what I could get.

20      Q    Did she suggest any other house to you?

21      A    No, she said she was supposed to come into lots

22  of money and she would buy me a house and I said, I don't

23  know you, how you gonna buy me a house?  And she said she

24  was coming to lots of money and she would buy me a house.

25  I said, I don't know you and I don't need you to buy me no

1   house, that is what I tell her back in my living room.

2       Q    Okay.  And did you ever give her permission to

3   run your credit again?

4       A    No, I did not.

5       Q    So other than the foreclosures that were ten or

6   fifteen thousand dollars, you didn't give Carla Knight any

7   permission to run your credit or use your social security

8   number for any other house?

9       A    No, sir.

10      Q    By the way how old are you?

11      A    Eighty years old.  I was born in 1924.

12      Q    Okay.  And all of your conversations with Carla

13  Knight other than that first one you described with the

14  Prescott's they occurred here in your house, correct?

15      A    Yes.

16      Q    You mentioned that you get five hundred --

17      A    Five hundred and eighty four dollars a month from

18  the government.  That is what I get.

19      Q    Do you have any other source of income?

20      A    No.

21      Q    Now, you are receiving five hundred and eighty

22  four dollars and you said your rent was a hundred and six

23  dollars a month?

24      A    A week.

25      Q    Right.  So per month that is four hundred and

1    twenty four dollars in a four week month?

2         A    Yes.

3         Q    So you only have about a hundred and sixty

4    dollars to pay your bills with?

5         A    When it is four weeks in the month I leave a

6    hundred dollars in the bank, for when I have a little

7    money --the only time I take it out is when there is five

8    weeks in the month, then it is five hundred and something

9    dollars, that is the way it goes.

10        Q    All right.  Did you ever tell Carla Knight that

11   you were interested in paying for a house that cost over

12   three million dollars?

13        A    No, that was never mentioned, the only thing was

14   mentioned, she said she was coming in on lots of money,

15   like I tell you before, she wanted to buy me a house, I

16   say, You don't even know me, how can you buy me a house?  I

17   don't need you to buy me a house.  She said she was coming

18   in on lots of money.

19        Q    Okay.  Did you ever sign any documents for her to

20   use any of your credit?

21        A    No.  No.

22        Q    You mentioned before that there was an

23   intercostal or --

24        A    Yes, what happened was --

25             MR. KORCHIN:  Can you finish asking the question?

1          MR. WALLACE:   Sure.

2    BY MR. WALLACE:

3          Q    There was an intercostal Mortgage or something

4    like that that you saw on one of your credit reports?

5          A    Yes.

6          Q    Do you remember the name of that company?

7          A    I think Coastal Mortgage Company.  No, but what

8    happened, let me get back to --

9          MR. KORCHIN:   Objection --

10         MR. WALLACE:   He is objecting because I haven't

11         asked a question.   I will ask you another question.

12   BY MR. WALLACE:

13         Q    What happened with Coastal Mortgage as far as you

14   know?

15         A    As far as I know she put the house, she was

16   trying to get on the credit, the credit went into Telefax,

17   Atlanta Georgia.

18         Q    You are talking about the credit report?

19         A    The credit report.  It was twenty five dollars to

20   fix it but when I went to --she tell me she couldn't do it

21   without sending in some money, so --she got on the phone

22   and she called the mortgage company --

23         Q    Let me interrupt for a second, you are referring

24   to state senator, Mandy Jackson?

25         A    Right.

Page 16

```
 1        Q    Okay.  And you complained to her about what had

 2   happened with your credit?

 3        A    Right.  And she said when the credit comes back I

 4   didn't understand it, I got a lady to take me to her office

 5   and she looked it over and she said she put the mortgage on

 6   my credit.  There also was a number on it.  She called

 7   Coastal Mortgage Company and asked her lots of questions to

 8   them concerning me.

 9        Q    Are you talking about the person from Mandy's

10   office?

11        A    Jay Taylor, that is her name, I have her card

12   right here for her and she was asking Coastal Mortgage, he

13   told her I had one --I didn't sound, otherwise the person

14   that gave him the credit from me, I didn't sound like the

15   lady, it was a different voice.

16        Q    Now, let me ask you just a couple more questions.

17   Do you know the name Linworth Garrick?

18        A    No.

19        Q    How about Joseph Pannico?

20        A    No.  I have never heard of them names before.

21        Q    And you never gave anybody who represented

22   themselves as either Linworth Garrick or Joseph Pannico

23   permission to run your credit?

24        A    No, I don't know them.

25             MR. KORCHIN:  Objection, leading.
```

Page 17

1    BY MR. WALLACE:

2        Q    Let me rephrase the question.  Did you ever give

3    Linworth Garrick or Joseph Pannico permission to run your

4    credit or use your social security number?

5        A    No, I did not.

6        Q    Did you ever give Carla Knight, other than the

7    fifteen thousand dollar foreclosure home, after that, did

8    you ever give her permission to use your social security

9    number again, or to run your credit?

10       A    No, I did not.

11       Q    Have you ever met someone who you thought was

12   Carla Knight's boyfriend?

13       A    No, I never met Sam, I have heard a lot of talk

14   about him but I never met him.

15       Q    Okay.  Let me ask you, I am going to show you

16   what has been admitted as government's exhibit number six.

17   Do you recognize the person in that license, that driver's

18   license photograph?

19       A    No, I have never seen him before in my life.

20       Q    All right.  And do you know a Gary Berman?

21       A    No, I do not.

22       Q    Do you know any of Carla Knight's relatives other

23   than her mother who you mentioned?

24       A    That is all, I met Carla Knight's mother and her

25   daughter.  The only reason I met them, Carla Knight's

1    mother came her trying to get me to waive Carla Knight

2    living in a jail.  But a week later I called the police and

3    I told --then two days later she brought Carla's sixteen

4    year old daughter, she stayed in the yard, the mother, the

5    daughter come and --that I was wrong because Carla didn't

6    own no houses but the one across the street at upper 9th

7    Avenue, I said, You get off my porch.  So I called the

8    police again, 9-1-1 and then Clinton Ward came out here and

9    he ran over to her mother house and tell her mother --

10        Q    Okay.  And Clinton Ward is the detective from the

11   local police station.

12             MR. WALLACE:  Okay.  Ma'am, I don't have any

13        other questions for you.

14             MR. KORCHIN:  I just need a couple of minutes.

15             MR. WALLACE:  Sure.  Let's take a few minutes

16        break.

17             (Thereupon, a recess was had.)

18             MR. WALLACE:  I would like to make a statement

19        for the record.  Mr. Kochin stepped out of the room to

20        continue reading the Jenks material that I provided to

21        him concerning Ms. Davis, and during that time Ms.

22        Davis made several statements to me concerning the

23        case that were not prompted by any questions from me.

24             MR. KORCHIN:  At the conclusion of Ms. Davis'

25        testimony, government counsel stated that he had no

1     further questions.  Just before Ms. Davis' testimony

2     started, government counsel provided me with Ms.

3     Davis' Jenks' material here inside Ms. Davis'

4     apartment today May 28th of 2004.  The direct

5     testimony of Ms. Davis was taken by government

6     counsel, I had not read the Jenks' material before the

7     direct testimony began.  Ms. Davis' testimony then

8     ensued, government counsel indicated that he had no

9     further questions, this deposition is being taken in

10    Ms. Davis' bedroom and Ms. Davis is in her bed,

11    reclining in her bed.  The only other person seated in

12    a chair is the court reporter.  Government counsel and

13    defense counsel are standing as well as the probation

14    officer Mr --are standing in Ms. Davis' bedroom for

15    the deposition.  Consequently, at the conclusion of

16    Ms. Davis' testimony, defense counsel exited the

17    bedroom in order to read the Jenks material and the

18    Jenks material consists of a nine page type written

19    interview with Ms. Davis on a prior occasion.  While

20    defense counsel was in Ms. Davis' kitchen reading the

21    Jenks material, defense counsel was able to overhear

22    the fact that there was a conversation occurring in

23    Ms. Davis' bedroom, apparently between Ms. Davis and

24    government counsel.  Now upon completing reading the

25    Jenks material, defense counsel has reentered the

```
 1        bedroom and government counsel has informed defense

 2        counsel that there was a conversation while defense

 3        counsel was in the kitchen reading the Jenks material,

 4        there was conversation between Ms. Davis and

 5        government counsel.  And government counsel has

 6        informed defense counsel that as a result of that

 7        conversation that occurred while defense counsel was

 8        in the kitchen reading the Jenks material, government

 9        counsel would like to ask Ms. Davis some further

10        questions.

11            In light of the fact that government counsel

12        indicated that the direct testimony was concluded, the

13        defense would object to a reopening of the direct

14        testimony.

15            MR. WALLACE:  Let me make some clarification.

16        First there was not a conversation, nor have I told

17        defense counsel there was a conversation.  I have

18        stated that MS. Davis made some statements to me.  The

19        only questions that I believe I asked were in

20        reference to a house that she pointed out across the

21        street that she said Carla Knight owned, I asked if it

22        was the green house, she said, Yes.  I asked the

23        probation officer why was it boarded up?  He said he

24        didn't know, Ms. Davis then stated that the city had

25        boarded the house and made no more statements about
```

Page 21

1      the house.

2            THE WITNESS:  That is right.

3            MR. WALLACE:  I believe that I had provided Ms.

4      Davis' statement to defense counsel on Tuesday, I

5      informed him of such before we started the direct

6      examination, I gave him an additional copy, my only

7      remaining copy for him to utilize at this hearing.  We

8      are in here standing, everybody but the court reporter

9      and Ms. Davis who is in her bed.  There are chairs

10     available that can be brough in similar to the one

11     that is being utilized by the court reporter.  There

12     are at least two more chairs visible to me.  Defense

13     counsel volunteered to stand up during this deposition

14     and left the room of his own accord to read the

15     statement of Ms. Davis.

16           The questions that I have for Ms. Davis --

17           MR. KORCHIN:  I am sorry, I have another --

18           MR. WALLACE:  You have made your statement.

19           MR. KORCHIN:  Well, I need to do a follow up.

20           MR. WALLACE:  Well you can make it during your

21     time.  The questions that I have to ask Ms. Davis,

22     are, you mentioned before, you mentioned the word

23     Halifax, did you mean the word Equifax?

24           THE WITNESS:  The one that is on that paper, that

25     is my credit right there.  I take it out once a year.

1          MR. WALLACE:  The record should reflect that

2     prior to this, Ms. Davis showed me two of her credit

3     reports that I had never seen before this, they are

4     still in her possession that refer to Equifax as

5     opposed to Halifax.  And there was another

6     pronunciation, you referred to Coastal, could you have

7     meant intercostal, or do you recall the name?

8          THE WITNESS:  I recall the name, it is a mortgage

9     company t hat came on my credit because when it came

10    back on my credit, I took it to that lady, I just gave

11    you the card Jay Taylor, she sent it to Mandy Dawson's

12    office, I took it to her.

13         MR. WALLACE:  And let the record reflect that the

14    card that Ms. Davis is referring ot is a card that she

15    just passed to me while Mr. Korchin was making his

16    statements that I am now passing back to her.  That is

17    my questions.

18         MR. KORCHIN:  Just for the record, I did not get

19    Ms. Davis' Jenks material before today, the day of the

20    deposition.

21         MR. WALLACE:  Mr. Korchin, you will agree though

22    that when I asked you that you told me you didn't

23    think that you had gotten it and I gave it to you

24    anyway.  Are you saying now that you are sure you

25    didn't get it?

1          MR. KORCHIN:  I don't have it, I didn't get it.

2     I got the Jenks material Pannico, Berman and Garrick.

3          MR. WALLACE:  And finally, as the court is aware,

4     Jenks material need not be turned over to defense

5     counsel until direct examination has ended and in this

6     particular instance, defense counsel got the Jenks

7     material at the very latest according to his own

8     admission before the direct examination began.

9          MR. KORCHIN:  I will just say one final

10    statement.  The defense is not objecting to when the

11    defense received the Jenks material.  The government

12    provided Ms. Davis' Jenks material to defense counsel

13    today just before the direct testimony of Ms. Davis.

14    There is noting in contrary about that.  Defense

15    counsel is just trying to make the point to correct

16    plaintiff's counsel's statement that it had been

17    provided on Tuesday but if it was not provided on

18    Tuesday and it was provided today as defense counsel

19    has represented, there is nothing improper about that.

20    Defense counsel was simply trying to explain the scene

21    here at the deposition and why the defense counsel was

22    out of the room while Ms. Davis was making the

23    statements.  Okay.

24                    CROSS EXAMINATION

25    BY MR. KORCHIN:

Page 24

1      Q    Ms. Davis, with respect to giving Carla Knight

2   your credit history, you testified here today that you did

3   that orally, correct?  You just told her?

4      A    I told her, I didn't give her anything.  When she

5   told me about the foreclosure, I said I would like to buy

6   one.  I asked her the price, she said ten or fifteen

7   thousand dollars.

8      Q    Excuse me, let me just ask you some questions and

9   you just respond to my precise questions.

10     A    Okay.

11     Q    So you are saying today that you didn't give

12  Carla Knight any documents that showed your credit history?

13     A    No, I did not.

14     Q    Were you interviewed or do you remember being

15  interviewed by Detective Clinton Ward on July 24th, 2003

16  here in your apartment?

17     A    Yes, I did.  He took my deposition.

18     Q    Okay.  Did he ask you the following questions and

19  did you give these answers?

20     A    I can't remember, this was last year.

21     Q    I am going to read the questions in his report.

22     A    Okay.

23     Q    Did he ask you these questions and did you give

24  these answers?

25          QUESTION:  I am going to read a series, please

1    wait till I am done with the series of questions and

2    answers.

3              So you were talking about foreclosures that you

4    had the option to buy?

5              ANSWER:  Well, I figured by foreclosure from her.

6              QUESTION:  Okay.

7              ANSWER:  Then she told me she needed to get my

8    credit, I gave her my credit.

9              QUESTION:  You mean your social security number?

10             ANSWER:  No, I gave her the credit from fax.  The

11   paper for her to look at.

12             THE WITNESS:  No, no.

13             MR. KORCHIN:  Hold on, please.

14             QUESTION:  Oh, so you had a credit evaluation on

15        yourself already?

16             ANSWER:  Yes.

17             QUESTION:  So you gave her the Credit report to

18        look at?

19             ANSWER:  Right.

20             THE WITNESS:  No, no, I didn't give her my credit

21        to look at anything, I don't care what --I gave her no

22        credit paper, just conversation talk.

23   BY MR. KORCHIN:

24        Q    Okay.  So you are saying you did not say this to

25   Clinton Ward?

Page 26

```
 1        A    No, I didn't tell him I gave her my credit.  No,
 2   I did not --no, I did not do that.
 3        Q    Okay.
 4        A    I never gave her my credit papers.  I have gone
 5   one back in there for last year, I paid twenty five dollars
 6   and it came back good.  I got it right in that draw right
 7   there.  Why would I give you ny papers if I don't know you?
 8        Q    Okay.  I understand you are upset, I just have to
 9   ask you a few questions.  Now, there came a time when Ms.
10   Carla Knight came here to your home to get a correct social
11   security number from you, correct?
12        A    Yes.
13        Q    And you gave Ms. Knight your correct social
14   security number?
15        A    Yes, I did.  ███████████.  At the time I was
16   talking to her about it, somebody called her on the
17   cellular phone and asked her if the number that I gave her
18   was the right number, so help me God.  Somebody called her
19   on the phone.  I don't give nobody my stuff.  You think I
20   am crazy?
21        Q    Did you ever receive a phone call from Joseph
22   Pannico --
23        A    No, I didn't --
24        Q    Let me finish the question.
25        A    Okay.  Go right on.
```

1       Q    Did you ever receive a phone call from Joseph

2  Pannico at a mortgage company asking for your correct

3  number?

4       A    No, I did not.  Nobody called me from nowhere.

5       Q    You mentioned an incident where Ms. Knight's

6  daughter stood on your porch, was that in July?

7       A    I can't tell you exactly when it was, when

8  Carla's mother came, I can't tell you what day it was, but

9  I called 9-1-1 and they didn't come.  Then Ms. Mores, she

10  called them and they still didn't come, about an hour later

11  they said they had a shooting case --

12       Q    I am sorry, let me ask you just a few questions

13  so I can understand.  These incidents where you said Carla

14  Knight's mother came here and when Carla Knight's daughter

15  came here, are those two separate dates or are they the

16  same?

17       A    They are separate dates.  It was three or four

18  days later.  One day I came from the daughter on a walking

19  cane and she was standing at my door.  I walked on by, she

20  said, I want to see you.  And then she walked up to me --

21       Q    Excuse me, when you say she who are you referring

22  to?

23       A    Carla's --Daisy Knight.

24       Q    Okay.

25       A    She asked me would I waive a statement for Carla,

Page 28

1    I said No.

2        Q    I am sorry, what did she --

3        A    She said would I waive a paper, I don't know what

4    kind of paper, what it is called, I said no.  That was on

5    the sidewalk.

6        Q    So in relationship to that conversation with

7    Daisy Knight, was the conversation with Carla's daughter

8    before that or after that?

9        A    Carla's daughter came after that.  She brought

10   her daughter, the grandmother, Daisy Knight brought Carla

11   Knight's daughter here, she stood in the yard and the girl

12   came up on my porch.

13       Q    This was after --

14       A    After the first --

15       Q    Approximately how long after?

16       A    I can't tell you that, it was a few days.

17       Q    Okay.  Now, what was Carla Knight's daughter

18   saying?

19       A    Saying I shouldn't have put her momma in jail,

20   'cause her momma own the house across the street and

21   another house.  I say, Yeah, I put your momma in jail

22   because she used my credit.  She started to go on, I said,

23   Get of my porch, and she walked off my porch and her and

24   her grandmomma left.

25       Q    Okay.  Now, referring again to this interview

1    that you gave to Detective Clinton Ward on July 24th 2003,

2    you remember it?

3        A    I don't know when it was.

4        Q    You did give that interview?

5        A    Right.

6        Q    The one we talked about before?

7        A    Yes.

8        Q    Did you mention this incident with Carla Knight's

9    daughter at all during that interview?

10       A    No.  I didn't say nothing to her, no more would

11   she say it to me, she said, Her momma didn't do it, she say

12   her momma own the house across the street and another

13   house.

14       Q    I am sorry, let me interrupt you for a second.

15   Listen to the question?

16           MR. WALLACE:  I am going to object to the

17           question it is not relevant.

18   BY MR. KORCHIN:

19       Q    The question I asked was, did you mention to

20   Detective Ward when he interviewed you here about the

21   incident where Carla Knight's daughter came and spoke to

22   you?

23       A    Yes, I did, I called him up, I called him up when

24   Daisy Knight came there, I called the police first and the

25   police did not come, I called Ms. Moss or whatever her name

1    is down town, she called 9-1-1.

2        Q    I am unclear.  Let me try to get this straight.

3    When Detective Ward came here and interviewed you about

4    your dealings with Carla Knight in July of 2003, did you

5    mention to hin during that interview about the time when

6    Carla Knight's daughter came to talk to you?

7        A    It was after that.

8        Q    Okay.  So let me just make it clear in my mind.

9    So when Carla Knight's daughter came to talk to you it was

10   after the interview with Clinton Ward?

11       A    Yes, the momma came before the daughter.

12       Q    Okay.  I understand now.  Ms. Davis, did Carla

13   Knight ever ask you or have you sign any papers of any

14   kind?

15       A    No, sir.  So help me God.

16       Q    She didn't have you sign any documents?

17       A    No documents or nothing.

18       Q    No application?

19       A    No nothing.  She didn't ask me to do anything but

20   the conversation that I had with her that I told you about,

21   I didn't sign no paper or show her anything, just talking

22   like me and you talking.

23       Q    Okay.  I have no further questions.

24            MR. WALLACE:  I have no redirect.

25            THE WITNESS:  Anything you want to know call this

1        lady, all the stuff was done in her office, I dook the

2        credit file to her and she called the mortgage

3        company.  Call her and ask her.  The man say the voice

4        was not the voice Carla gave them.

5            (Thereupon, the deposition concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 32

1                           CERTIFICATE

2      STATE OF FLORIDA       )
                              ) SS.
3      COUNTY OF DADE         )

4              I, BARBARA WINER, A NOTARY PUBLIC AND REPORTER OF
       THE STATE OF FLORIDA, DO HEREBY CERTIFY THAT PRIOR TO
5      THE COMMENCEMENT OF THE EXAMINATION OF MARY DAVIS WAS
       SWORN BY ME TO TESTIFY THE TRUTH, THE WHOLE AND
6      NOTHING BUT THE TRUTH.

7              I DO FURTHER CERTIFY THAT THE FOREGOING IS A TRUE
       AND ACCURATE TRANSCRIPT OF THE TESTIMONY AS REPORTED
8      BY AND BEFORE ME AT THE TIME, PLACE AND THE DATE
       HEREIN BEFORE FORTH.

9

10             I DO FURTHER CERTIFY THAT I AM NEITHER A RELATIVE
       NOR EMPLOYEE NOT ATTORNEY NOR COUNSEL OF ANY OF THE
11     PARTIES TO THIS ACTION, AND THAT I AM NEITHER A
       RELATIVE NOR EMPLOYEE OF SUCH ATTORNEY OR COUNSEL, AND
12     THAT I AM NOT FINANCIALLY INTERESTED IN THE ACTION.

13

14             WITNESS MY HAND AND OFFICIAL SEAL IN THE CITY OF
       FORT LAUDERDALE, COUNTY OF BROWARD, STATE OF FLORIDA,
       THIS 11TH, DAY OF JUNE, 2004.
15

16

17

18     BY: _Barbara Winer_____
       BARBARA WINER
19     REPORTER

20

21                                      TIC/DS

22

23

24

25

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 05-13351-JJ

UNITED STATES OF AMERICA,

      Appellee,

- versus -

CARLA KNIGHT,

      Appellant.

_____/

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel for the United States of America hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case who were not included in previous Certificates of Interested Persons filed with the Court.

R. Alexander Acosta

Gary Berman

Hon. Stephen T. Brown

Mary Lee Davis

Harriett Galvin

Lennox A. George

**United States of America v. Carla Knight, Appeal No 05-13351-JJ**

**CERTIFICATE OF INTERESTED PERSONS (CONT'D)**

Carol Herman

Anne R. Schultz

Harriett Galvin
Assistant United States Attorney